UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| S.H.,<br><br>                    Plaintiff,<br><br>          v.<br><br>ISSAQUAH SCHOOL DISTRICT,<br><br>                    Defendant. | CASE NO. 2:21-cv-00137-DGE<br><br>ORDER ON CROSS MOTIONS<br>FOR SUMMARY JUDGMENT<br>AND REMANDING FOR<br>FURTHER PROCEEDINGS |

This matter comes before the court on cross Motions for Summary Judgment.  (Dkt. Nos. 13, 20.)  The Court considered the pleadings filed in support of and in opposition to the motions, and the files and records herein, and hereby REMANDS this matter for further proceedings.

## I.     PROCEDURAL HISTORY[1]

---

[1] The Administrative Record is found at Dkt. Nos. 11-2 through 11-15.  Each page is numbered at the top right-hand corner beginning at 1 and ending at 7388.  In accordance with Local Civil Rule 10(e)(6), the Court's normal practice is to cite to the record by identifying "Dkt. No. __ at __ ".  However, because the entire Administrative Record is sequentially numbered, the Court believes it more appropriate to cite "AR" rather than "Dkt. No." when citing to the Administrative record.

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT AND REMANDING FOR FURTHER
PROCEEDINGS - 1

This matter involves claims under the Individuals with Disabilities in Education Act, 20 U.S.C. § 1400 *et seq.* ("IDEA").  (Dkt. No. 21.)  Plaintiffs are Plaintiff G.H. ("Father"), Plaintiff P.H. ("Mother") and Plaintiff S.H. ("Student").[2]

Plaintiffs requested an IDEA due process hearing on October 14, 2019.  (AR at 3247.)  Plaintiffs amended the initial due process hearing request on January 23, 2020.  (AR at 3517.)  Plaintiffs asserted Defendant Issaquah School District (the "District") denied Student a free and appropriate public education ("FAPE") during the 2016-2017 school year; denied a FAPE during the 2017-2018 school year; and denied a FAPE during the 2018-2019 school year.  (AR at 3529-3530.)  Plaintiffs sought reimbursement for costs and expenses related to Student's private placement and for the cost of a 2016 private evaluation.  (*Id*.)  The District denied Plaintiffs' assertions and requests for reimbursement.

A due process hearing was conducted over several days during the summer of 2020 before an administrative law judge ("ALJ").  (AR at 4613.)  Following the conclusion of the hearing, the ALJ issued a lengthy written decision that included a significant number of findings of fact and conclusions of law.  (AR at 4613-4664.)

The ALJ denied the 2016-2017 school year FAPE claim based on the applicable statute of limitations and concluded that no exception to the limitations period applied.  (AR at 4648-4652.)  Regarding the 2017-2018 school year, the ALJ concluded the District failed to refer Student for a special education evaluation, denied Student a FAPE, and deprived her of educational benefits.  (AR at 4656.)  In addition, the ALJ concluded Student's private placement was proper and that tuition reimbursement was appropriate.  (AR at 4659.)  However, the ALJ determined that reimbursement for Student's private placement terminated as of December 31,

---

[2] Plaintiffs are not identified by name to maintain confidentiality and instead are referred to as "Father", "Mother", and "Student".  Father and Mother are collectively referred to as "Parents".

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT AND REMANDING FOR FURTHER PROCEEDINGS - 2

2018, the date Parents moved out of the District. (AR at 4660) ("After the Parents moved, there was insufficient nexus to the Student to continue to hold the District responsible for the ongoing provision of FAPE. The District's obligation to serve the Student ended when her Parents moved to Northshore."). As a form of additional compensatory education, the ALJ awarded 25 percent of the Student's private placement costs and related expenses incurred after December 31, 2018. (AR at 4663.)

The ALJ did not consider whether the individual education plan ("IEP") offered by the District in March of 2019 was reasonably calculated to offer the Student a FAPE. Instead, she concluded, "the District had no obligations to provide Student with FAPE after the Parents moved out of the District in December 2018[.]" (AR at 4663.)

On appeal, Plaintiffs assert the ALJ erred (1) in concluding that the 2016-2017 denial of FAPE claim was barred by the statute of limitations; (2) in concluding the District's obligation to reimburse private placement costs terminated on December 31, 2018; and (3) in failing to address the 2018-2019 denial of FAPE claim. (Dkt. No. 13.) The District did not appeal any of the ALJ's findings or conclusions of law and otherwise asks the Court to affirm the ALJ's decision in full.

## II.    RELEVANT FACTS

Student enrolled in the District in the first grade. (AR at 3174.) She began seeing a therapist for separation anxiety in the fourth grade. (AR at 3175.) During the 2014-2015 school year, Mother began to notice Student was anxious and distracted by her peer relationships and that Student struggled with completing homework assignments. (AR at 2533.) The anxiety and distraction related to Student's peer relationships continued through the 2015-2016 school year. (AR at 2535-2536.) Mother communicated with Student's school counselor and others about the peer issues and their effect on Student, Student's anxiety, and Student's attendance. (*Id.*, AR at

2540, 2545, 5247, 2561.)  The school counselor provided Mother with names of therapists or counselors and encouraged Mother to seek counseling for Student's anxiety and emotional issues.  (AR at 2547.)  During the 2015-2016 school year, Student was absent 20 days and tardy for 26 periods.  (AR at 5146.)

### A.  2016-2017 School Year.

Prior to the beginning of the 2016-2017 school year, Plaintiffs moved within the District. As a result, Student began the eighth grade at Pacific Cascade Middle School ("PCMS").  (AR at 2514-2515.)  A major reason for moving houses was so that Student could attend a different middle school.  (AR at 2515.)  "Student was having issues with being bullied" and Student "wanted a fresh start" at a different middle school within the District.  (AR at 2514-2515.) Parents also believed Student's academic performance "was being driven by the social issues, so we did hope that the move would give her a better footing to regain her academic performance." (AR 2920.)  Moreover, Parents moved to upsize their house.  (AR at 2919.)

Before Student commenced eighth grade, Parents hired Dr. Gayle Fay, a clinical neuropsychologist, to administer a neuropsychological evaluation.  (AR at 5472.)  Dr. Fay produced a report dated October 6, 2016 (AR at 5471-5486) and discussed the results with Plaintiffs.  (AR at 122, 2584, 2586.)  Dr. Fay offered to meet with the District to discuss the evaluation results.  (AR at 75.)  Parents declined the offer because they believed they could have the conversation with the District.  (AR at 2927.)  They also believed the District would understand the written report and that it would provide appropriate guidance.  (*Id*.)  Parents also were concerned about the costs of Dr. Fay's continued services.  (*Id*.)

Dr. Fay diagnosed Student with moderate to severe Attention Deficit Disorder (ADD) and with a "specific learning disability" in reading and math.  (AR at 5485.)  Dr. Fay recommended one-to-one coaching for math, which she testified meant:

...a more individualized program. It means sitting with somebody and having them explain the information, for having an opportunity to practice the concept and its applications, and then her academic support person would help her aggregate that so she could, in fact, use the whole variety of different skills to move forward in terms of her mathematical capabilities.

(AR at 86.) Dr. Fay further explained,

It generally means that an individualized program - - and I think I have described it in terms of math - - where, in fact, they are - - the client is receiving direct instruction from a licensed professional or certified professional and that course of learning is carefully designed to meet the needs of that particular individual, not only within the framework of their ability to progress and move through the content that is presented, but also within the framework of their disabling condition.

(AR at 91-92.) District staff had a different understanding of Dr. Fay's one-to-one coaching recommendation. School counselor Sonja Petersen testified:

Well, I think to me one-to-one coaching would be additional help from her teacher. Looking at that one-to-one coaching in the area of math and then semi colon because of her impressive cognitive ability, she has the capability to be very successful in this area. So in my eyes, that entire statement says she is behind, she needs help to catch up and fill those gaps and she has the ability to be successful in this area. And so, you know, that comes in lots of different forms, sometimes through Study Skills, which she had in her schedule, which can be extra time to do homework, but can also be digging in on some review work or I know that for a while we used a program in Issaquah call IXL where students were actually using computerized program to go back and learn and kind of fill some of the gaps.

I don't know whether that was something we did with the Student at all during that year, but those are the kinds of things that come to mind as well as, you know, the opportunities to meet with her teacher, you know, either during Links Lifetime, or advisory period, before school or after. We have a lot of kids with gaps in their knowledge, and sometimes it does just take – that extra effort during those times to help them get caught up.

(AR at 498-499.)

Dr. Fay suspected Student had a disability and that student needed special education. (AR at 95.) Dr. Fay further opined the District should have considered "individualized educational services for her or at least initiate an evaluation" upon reviewing her report. (AR at 96.) Dr. Fay, however, could not recall ever discussing the need for special education with the

family.  (AR at 93.)  Parents also testified Dr. Fay never discussed the possibility of special

education or of requesting the District conduct an evaluation for special education.  (AR at 2278,

2585.)

Student also underwent a clinical interview via Dr. Fay's office "to gain further

information regarding [Student's] affective status," which resulted in an additional report dated

November 23, 2016.  (AR at 5030.)  Parents did not receive a copy of the written report.  Mother,

however, did discuss the clinical interview results with the interviewer.  (AR at 2941-2942.)  The

District did not receive a copy of the clinical interview report.  (*Id*., AR at 4620.)

Parents participated in a school guidance team meeting at PCMS on October 21, 2016.

The purpose of this meeting was to identify interventions to assist Student.  (AR 5644.)  The

effectiveness of any proposed interventions would be evaluated for a period of four-to-six weeks,

after which the District would consider whether to initiate a section 504 plan.[3]  (*Id*.)  The District

was provided Dr. Fay's report before the meeting.  (AR at 2585.)  Thereafter, on October 28,

2016, the District produced an action plan to attempt to assist Student.  (AR at 5331-5332.)

The day before producing the action plan, Prime Numbers, a private tutoring company,

assessed Student's math abilities.  (AR at 5537.)  Prime Numbers opined that Student

"demonstrated understanding on approximately 50% of the 6th grade math topics that were

assessed.  She has not yet mastered many essential pre-algebra skills and topics that are

prerequisite for success in Algebra."  (AR at 5533-5534.)  Parents provided the assessment to the

District on October 29, 2016.  (AR at 5333.)  Parents and the District discussed the possibility of

---

[3] A section 504 plan refers to section 504 of the Rehabilitation Act of 1973, which, in general terms, prohibits discrimination against a person with a disability.  Section 504 plans are designed to provide support and accommodations to a student with a disability but do not require specially designed instruction.  *See* 29 U.S.C. § 794.  An IEP falls under the IDEA and is required to be in writing.  An IEP must identify specially designed instruction tailored to a student, with specific goals and objectives.  *See* 20 U.S.C. § 1414(d)(A).

1    moving Student down to seventh grade math, although the District noted this could create future

2    problems because eight grade math would not be offered in high school.  (AR 5338.)  The

3    District suggested Student could access eighth grade materials through a private summer

4    program or through District Summer school.[4]  (AR at 4622, 2582.)

5        A second guidance team meeting was conducted on February 16, 2017, more than four to

6    six weeks after the initial guidance team meeting.  (AR at 5469.)  This second meeting was to

7    evaluate the need for a 504 plan.  (*Id*.)  A 504 plan was formally adopted on March 31, 2017.

8    (AR at 5607.)  PCMS principal, Dr. Dana Bailey, was unable to identify the reasons for the delay

9    between the first guidance meeting and the formalization of a 504 plan.  (AR at 1683) ("I don't

10   know that I know why it took until March 31st to formalize it.  I do know many of the

11   interventions that were formalized were on-going throughout those weeks.").

12       District staff had significant concerns about the extent of the Student's mental health and

13   learning disabilities throughout the 2016-2017 school year.  The school counselor testified, "I

14   knew that she had a disability, yes."  (AR at 191.)  The counselor also suspected Student's

15   disability was interfering with her academics.  (*Id*.) ("[D]id you suspect that that disability was

16   interfering with her academics? Yes.").  Dr. Bailey wrote, "given that we see a real and

17   debilitating issue for [Student]…one idea is to look at doing a few things well and truly lighten

18   her load. … I think her true learning struggles may have been masked by all of this drama!"  (AR

19   at 5671).  Dr. Bailey also expressed,

20           …  I am egregiously worried about her mental health.  The suspicious thinking,
21       calling out for help to random people of authority (as in our superintendent) and
         creating or adding to a targeted social media site…  I think she is having some sort
22       of mental health break.  and I'm really, really worried.

23   _____

     [4] It is noted that the District, through Dr. Dana Bailey, identified that summer school could not
24   be offered until Student was in high school, which meant that summer school would not have
     been available to Student at that point in time.  (AR at 1734-1735.)

1   (AR at 5547.)  Student's Parents also communicated regularly with District staff about Student

2   and her struggles.  (*See, e.g.*, AR at 5369-5370, 5429, 5343-5344, 5553, 5571.)  These

3   communications included Student's comments about suicide when confronted about

4   cyberbullying another student in March of 2017.  (AR at 2618-2619.)  Moreover, the District was

5   aware Student was being placed on a partial day schedule in April of 2017 because of Student's

6   lack of success at school.  (AR at 490, 5608.)

7         Notwithstanding these concerns and the continued dialogue between Parents and the

8   District, the District did not believe a special education referral was appropriate for the Student.

9   (AR at 484.)  The District felt it needed sufficient time to evaluate the interventions being

10   utilized before engaging is a special education referral.  (AR at 1736.)  From the District's

11   perspective, "[i]t was not uncommon to take a full school year to move through these processes

12   [of observing and evaluating a student's behavior before moving towards special education

13   referral] in Issaquah."  (AR at 1737.)  On the other hand, Parents assumed any disability Student

14   suffered from was not severe enough to qualify for special education based on a brief

15   conversation between Mother and the Student's counselor – a conversation the school counselor

16   did not recall ever having.  (AR at 222-223, 2275, 2593-2495.)

17         The District did not provide Parents with IDEA procedural safeguards notice because

18   Student "was not a special education student."  (AR at 223.)  Moreover, special education was

19   never discussed as an option during the guidance team meetings.  (AR at 1740-1741, 2271-2273,

20   2593.)  It is unclear how Parents could have provided an opinion about the possibility of a

21   special education referral at the guidance team meetings if they had not been informed of such an

22   option.  (AR at 1741.)  On this issue, Dr. Bailey testified, "I think that is a fair question, and at

23   the time in 2016 I can just best answer by saying that is where we started with students who were

24

presenting with social/emotional struggles, and that I always felt like we were working in a positive direction with this particular family." (*Id.*)

As the 2016-2017 school year went on, Parents did not believe any of the interventions attempted during the year were effective.  (AR at 2597) ("Did I think they were effective?  No, I don't think they were effective.").  Parents also did not observe any Student successes that year.  (AR at 2600) ("I [considered] success attending class, passing grades, positive peer relationships, positive relationships with teachers.  And I didn't see any of that.").

In February 2017, Parents began contemplating a move to Texas.  (AR at 2612.) However, the decision to move was not made until April of 2017 after Mother received a job offer.  (AR at 2614.)  Parents were motivated to move because they wanted Student to have a "fresh start," to be near extended family, and ultimately because Mother was offered a job in Texas.  (AR at 2620.)  The move occurred the summer after the 2016-2017 school year, which Mother characterized as a "Hail Mary" to attempt to help Student.  (AR at 3196-3197, 4871.)

**B.  2017-2018 School Year.**

At the beginning of the 2017-2018 school year, Parents enrolled student at a large public high school in Texas.  (AR at 2621.)  The first two days Student hid in the bathroom and did not attend classes.  (*Id.*)  On the third day, Student refused to get out of the car to attend school.  (*Id.*) As a result, Parents enrolled Student in a smaller middle school as an eighth grader where she attended for one week before starting to hide in the bathroom.  (AR at 2622.)  Parents then realized it was no longer a matter of eighth versus ninth grade, or large versus small school and that they needed to do something else.  (AR at 2622-2623.)  Thereafter, Parents hired Dr. Valda Morgan, an educational consultant, to advocate for them and the Student at a 504 Plan meeting in Texas.  (AR at 2623.)  When asked about her mindset in communicating with Dr. Morgan,

1   Mother stated, "Well, I would say grasping at straws, trying to think of anything that might help,

2   trying to look for any solution - - that could get the Student to attend class."  (AR at 3146.)

3        Subsequently, Parents withdrew Student from the Texas middle school and enrolled her

4   in Mind Above Matter, an intensive outpatient counseling program.  (AR at 2625.)  This program

5   was a four-week program that Student completed in six or seven weeks because Student refused

6   at times to attend.  (AR at 2626.)

7        Upon completion of the Mind Above Matter program, Student was enrolled in Fusion

8   Academy on October 20, 2017.  (AR 4802-4803.)  Parents learned Fusion Academy offered

9   "one-on-one learning" and that it would assist Student in catching up.  (AR at 2627.)  Ultimately,

10  Parents felt, "we had to try something and [Fusion Academy] was the one that we felt best

11  about." (*Id*.)

12       Plaintiffs moved back to Washington in January of 2018 because they thought it would

13  be better for Student.  (AR at 2631.)  They signed a one-year lease beginning January 1, 2018 for

14  a home in Issaquah and remained in that home until December 31, 2018.  (AR at 2632-2633.)

15       Student enrolled in Issaquah High School ("IHS") (AR at 2634), where she continued to

16  face significant struggles during the remainder of the 2017-2018 school year.  Student failed all

17  of her classes at IHS, was absent from school 40 times, and was either tardy or absent for her

18  first period class 64 times.  (AR at 5947.)  Student also faced student discipline for "use and/or

19  possession of drugs and alcohol."  (AR at 6491-6500.)

20       The District never referred Student for a special education evaluation, and ultimately it

21  was concluded the District "violated the IDEA, and the Student was denied FAPE and was

22  deprived of education benefits, when the District failed to refer her for a special education

23  evaluation during the 2017-2018 school year."  (AR at 4656.)  The parties did not appeal this

24  conclusion.

1   **C.  Solstice RTC.**

2       1.  <u>Placement</u>.

3   Student was placed at Solstice RTC, a residential treatment center located in Utah, from

4   July 24, 2018 to September 3, 2019.  (AR at 2291.)  Student resided in Utah during this time

5   period with the exception of five or six brief home visits.  (*Id.*)  The placement occurred shortly

6   after Student had overdosed on alcohol for a third time in July of 2018.  (AR at 2259-2261.)

7   Solstice RTC offered a wholistic approach "where the academics and the academic team was

8   part of the therapeutic team and they work together to bring the child up to speed academically

9   while giving them the social, emotional and therapeutic tools…to regulate and think through[.]"

10  (AR at 2662.)  The decision to place Student at Solstice RTC was made as a "combination of

11  assurances [from Student's psychiatrist], a complete lack of any local support services that we

12  could find that were available and could possibly help us, and mostly just a desperation to save

13  my daughter's life."  (AR at 2661.)

14      Solstice RTC was determined to have been a proper placement for Student because the

15  "instruction provided to the Student was reasonably calculated to meet her academic needs, and

16  was supported by related necessary services."  (AR at 4659.)  The parties did not appeal this

17  conclusion.

18      2.  <u>Reimbursement Request and District's Special Education Evaluation</u>.

19      When Parents first contacted Solstice RTC, Mother asked how individuals paid for the

20  costs of its services.  The representative mentioned some residents have their school districts

21  cover the costs.  (AR at 3107.)  It was not until August 22, 2018, however, that Parents began

22  looking into whether the District might cover Solstice RTC's costs, which prompted parents to

23  email the District to request an individualized education plan ("IEP") because Parents believed it

24  was a prerequisite for obtaining reimbursement.  (AR at 3109, 3119, 4881-4882.)

1    On September 6, 2018, the District emailed Parents to schedule a guidance team meeting

2 to discuss the possibility of special education for Student.  (AR at 6570.)  Parents responded by

3 email on September 12, 2018 and informed the District that Student had been placed at a

4 residential treatment center in Utah, requested that the initial evaluation for an IEP be conducted

5 in Utah, and identified their intent to seek reimbursement for Student's placement.  (AR at 6569-

6 6570.)

7    On September 25, 2018, a guidance team meeting was conducted.  (AR at 2667.)  At the

8 meeting in which attorneys were present, the District provided Parents a copy of the "Notice of

9 Special Education Procedural Safeguards for Students and Their Families."  (AR at 2667-2668.)

10 After the meeting, the District issued A Prior Written Notice to initiate an evaluation for special

11 education.  (AR at 6585-6586.)  The Districted noted that Utah generally "objects to outside

12 evaluators," which meant performing an evaluation in Utah was not a "realistic option."  (AR at

13 6586.)  "Regardless, the District declines to send an evaluation team to Utah." (*Id*.)  In addition,

14 the District identified that,

> The District is declining to fund [Student's] unilateral placement at Solstice RTC
> unless and until her evaluation team finds her eligible for special education services
> and an IEP team determines Solstice RTC is necessary for her receipt of a FAPE.
> Further, as [Student] is currently no longer a resident of the District, she is not
> entitled to any services from the District.

18 (*Id*.)

19    Subsequently, the District withdrew and unenrolled Student from the District on October

20 10, 2018 for "20+ days of non-attendance."  (AR at 1007-1008, 6873.)  The District never

21 contacted Plaintiffs to inform them Student was unenrolled, and Parents never confirmed with

22 the District that Student had been unenrolled.  (AR at 2672-2673.)  However, Parents understood

23 the District unenrolled Student because the District stopped calling Parents to inform them that

24 Student was absent from school.  (*Id*.)

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT AND REMANDING FOR FURTHER
PROCEEDINGS - 12

Despite unenrolling Student and asserting it owed no obligations to Student, the District moved forward and retained Brooks Power Group to conduct an independent evaluation of the Student.   The evaluation occurred in December 2018 when Student was in Washington over a holiday break.  (AR at 4892-4918.)  Kate Odom, Psy.D. performed the evaluation.  (*Id.*)  When asked why it decided to continue with an evaluation of Student, the District responded, "We agreed based on the evidence of the guidance team meeting that we would move forward with an evaluation.  I think this statement [that the Student no longer resides in the District and is no longer entitled to any services] relates to her actually being present for the evaluation to take place."  (AR at 2047-2048.)

Parents moved from Issaquah to Bothell toward the end of December 2018.  They began spending nights in Bothell on December 20, 2018 and were fully moved out of their Issaquah residence as of December 31, 2018.  (AR at 2633.)  Their move was to avoid Student returning to the same environment upon her discharge from Solstice RTC.  (AR at 2674-2675.)  Parents did not inform the District of their December 2018 move.  When asked why Father did not inform the District of the move, he identified he was unable to respond without discussing attorney-client privilege.  (AR at 2516-2517.)  On the other hand, Mother stated,

> I didn't believe it was necessary because the Issaquah School District had unenrolled her from Issaquah High School.  So she wasn't - - she wasn't enrolled there, so it didn't seem necessary to me to advise that the student was - - that the student's family wasn't in the District because they knew she wasn't.  They knew she was in Utah and they unenrolled her.  So it just didn't strike me as necessary.

(AR 2672.)

On February 6, 2019, the District conducted a special education eligibility meeting to discuss Student and review Dr. Odom's evaluation report.  (AR at 6772.)  At the meeting, the District determined Student was eligible for special education.  (AR at 6777.)  Subsequently, Dr. Odom's report was produced to Parents on February 8, 2019.  (AR at 6770.)

1    On March 14, 2019, the District conducted an IEP meeting for Student.  (AR at 6799.)

2  At this meeting, the District learned Parents had moved out of the District and into the

3  Northshore School District.  (AR at 2679.)  In response, the District informed Parents that

4  Northshore School District would be responsible for providing special education services.  (*Id.*,

5  AR 2055.)  The District then proposed to initiate an IEP on March 19, 2019.  (AR at 6822.)  The

6  IEP opined the Student could immediately transition from Solstice to a comprehensive high

7  school with therapeutic supports.  (AR at 6823.)  The District did not consider Solstice RTC a

8  least restrictive environment under the IDEA because, "[t]he Student had not had any

9  opportunity to have an IEP with services in place, and that would be our first recommendation."

10  (AR at 2057-2058.)  In addition, the District identified that Dr. Odom had opined that a "robust

11  program outside of a residential setting" could be offered.  (AR at 2080.)

12    Dr. Trampas Rowden, Student's primary therapist at Solstice RTC, disagreed it was

13  appropriate in March of 2019 to transition Student to a comprehensive high school stating, "I

14  don't believe that at that time it was wise for [Student] to discharge from this level of care, given

15  that she was still right in the thick of the clinical work she was doing and - - with her then current

16  progress."  (AR at 745).  Dr. Rowden also identified his belief as to when it was appropriate to

17  discharge Student:

18        When she was able to demonstrate enough sustained progress not only here but
         over the course of the home visits with her family, home visits that included
19        increasing opportunities for self-directed decision-making and action without quite
         as much supervision, of course from here, but also from her parents, that she could
20        spend time for herself and manage herself when alone, that she was showing
         progress in terms of initiative, follow-through and responsibility related to her
21        academics and other responsibilities here on campus at home.

22        I often frame discharge readiness in terms of three things, that there is the student's
         readiness to discharge from this level of care, that there is the family's readiness to
23        receive that student and provide resources and support that will help sustain the
         progress that was made during treatment and that there is a community-based

24

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT AND REMANDING FOR FURTHER
PROCEEDINGS - 14

readiness to support both the student and the family with ongoing progress academically, socially, emotionally, and so forth.

(AR at 745-746.)

Student was discharged from Solstice RTC and returned to Washington on September 3, 2019.  (AR at 2291.)  Student never enrolled in the District again.  (AR at 4645.)  The District never paid or reimbursed Parents for private placement costs or expenses.  (*Id.*)

### III.    STANDARD OF REVIEW

In matters involving challenges to findings and conclusions issued after an IDEA due process hearing, a district court's review of a hearing officer's due process determinations "is in substance an appeal from an administrative determination, not a summary judgment." *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 892 (9th Cir. 1995).  This means the "burden of persuasion rests with the party challenging the ALJ's decision." *L.M. v. Capistrano Unified Sch. Dist.*, 556 F.3d 900, 910 (9th Cir. 2009).

> Under 20 U.S.C. § 1415(i)(2)(C), the district court reviews the records of the state due process hearing, hears additional evidence offered by the parties, and then 'basing its decision on the preponderance of the evidence, . . .  grant[s] such relief as the court determines appropriate.'  Thus, the statute commands the district court to review the evidence and come to its own conclusion about what relief is appropriate.

*Ashland Sch. Dist. v. Parents of Student E.H.*, 587 F.3d 1175, 1182 (9th Cir. 2009).

It is implied that due weight shall be given to the due process proceedings.  *Wartenberg*, 59 F.3d at 891.  This means a court "'must give deference to the state hearing officer's findings, particularly when . . . they are thorough and careful' . . .  and 'avoid substitute[ing] [its] own notions of sound educational policy for those of the school authorities which [it] reviews.'" *Parents of Student E.H.*, 587 F.3d at 1182 (first quoting *Seattle Sch. Dist., No. 1 v. B.S.*, 82 F.3d 1493, 1499 (9th Cir. 1996); then quoting *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1524 (9th Cir. 1994)).  "The amount of deference accorded the hearing officer's findings increases where they

are 'thorough and careful.'" *Wartenberg*, 59 F.3d at 891 (quoting *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1524 (9th Cir. 1994)).  This occurs "when the officer participates in the questioning of witnesses and writes a decision 'containing a complete factual background as well as a discrete analysis supporting the ultimate conclusions.'" *R.B., ex rel. F.B. v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 942 (9th Cir. 2007) (quoting *Park, ex rel. Park v. Anaheim Union High Sch. Dist.*, 464 F.3d 1025, 1031 (9th Cir. 2006)).  "Mixed questions of fact and law are reviewed de novo unless . . . the question is primarily factual." *Id.* at 937.

In the end, the district court must consider the findings "carefully and endeavor to respond to the hearing officer's resolution of each material issue," but the court "is free to accept or reject the findings in part or in whole." *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1311 (9th Cir. 1987) (quoting *Town of Burlington v. Dep't of Educ. for the Commonwealth of Mass.*, 736 F.2d 773, 792 (1st Cir. 1984), *aff'd*, 471 U.S.359 (1985)).

In addition, unchallenged findings and conclusions become verities on appeal.  *See Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1164 (9th Cir. 2003) (on appeal, courts "ordinarily will not consider matters on appeal that are not specifically and distinctly argued in an appellants' opening brief"); *Kim v. Kang*, 154 F.3d 996, 1000 (9th Cir. 1998) (declining to consider argument of an appellee where "[i]t does not designate itself a cross-appellant, and there is no indication that it has complied with any appellate procedural requirements, such as filing a timely notice of appeal.")

## IV.     DISCUSSION

**A. Affording Due Weight to the ALJ's Finding, The Court Concludes Plaintiffs Knew or Should Have Known of the Alleged Actions Forming the Basis of their 2016-2017 FAPE Claim No Later than September 2017.**

1.  <u>Statute of Limitations Commences When Parents Knew or Should Have Known of the Alleged Actions Forming the Basis of Their 2016-2017 FAPE Claim.</u>

Pursuant to 20 U.S.C. § 1415(f)(3)[5], the applicable statute of limitations for requesting a due process hearing under the IDEA is two years from the date a party knew or should have known ("KOSHK") of the actions forming the basis of their claim.  In applying 20 U.S.C. § 1415(f)(3), the Ninth Circuit adopted the Third Circuit's reasoning and concluded that "the IDEA's statute of limitations requires courts to apply the discovery rule[.]"  *Avila v. Spokane Sch. Dist. 81*, 852 F.3d 936, 941 (9th Cir. 2017) (citing *G.L. v. Ligonier Valley Sch. Dist. Auth.*, 802 F.3d 601 (3d Cir. 2015)).  This means "all but the most recent two years before the filing of the complaint [is] time-barred[.]" *Ligonier*, 802 F.3d at 620.

The determination of the KOSHK date requires more than simply identifying the date a parent became aware of an evaluation discussing a student's disability.  *Avila*, 852 F.3d at 944 ("[A]wareness of the evaluations does not necessarily mean [parents] 'knew or had reason to know' of the basis of their claims[.]") (citing to *A.G. v. Paradise Valley Unified Sch. Dist. No. 69*, 815 F.3d 1195, 1205 (9th Cir. 2016)[6]).

In addition, each party cited various decisions they assert provide guidance in determining the KOSHK date in this matter.  *See, e.g.*, *Avila; Somoza v. N.Y. City Dep't of Educ.*, 538 F.3d 106 (2d Cir. 2008); *Draper v. Atlanta Indep. Sch. Sys.*, 518 F.3d 1275 (11th Cir. 2008); *J.K. v. Missoula Cty. Pub. Sch.*, 713 Fed. Appx. 666, (9th Cir. 2018); *Avila v. Spokane*

---

[5] The State of Washington's regulation regarding the statute of limitations is functionally equivalent.  *See* Wash. Admin. Code § 392-172A-05080(2).

[6] *Paradise Valley* involved claims under section 504 of the Rehabilitation Act of 1973 ("section 504"), 29 U.S.C. § 794, and Title II of the American with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131-12134.  In determining whether such claims were barred in *Paradise Valley*, the Ninth Circuit relied on *J.W. ex rel. J.E.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 447 (9th Cir. 2010) in concluding that "a claim that meaningful access has been improperly denied within the meaning of [section 504 and the ADA] is not 'precluded or waived based on a parent's consent to an IEP'. . . at least where the issue is one that requires specialized expertise a parent cannot be expected to have."  815 F.3d at 1205 (citation omitted).

1   *Sch. Dist.*, 2018 WL 616140 (E.D. Wash. Jan. 29, 2018), *aff'd sub nom. Avila v. Spokane School*

2   *District 81*, 744 Fed. Appx. 506 (9th Cir. 2018); *Vandell v. Lake Washington Sch. Dist.,* 2019

3   WL 1123566 (W.D. Wash. Mar. 12, 2019).  What these cases indicate to the Court is that, by its

4   very nature, application of the discovery rule to determine the KOSHK date is a fact specific

5   inquiry and no two cases are identical.

6            2.   Due Weight is Afforded to the ALJ's Findings Regarding KOSHK Date

7            In the present matter, the ALJ wrote 178 specific findings before engaging in her legal

8   analysis.  (AR at 4616-4646.)  She cited the record in support of each finding.  (*Id.*)  The ALJ

9   actively participated in questioning witnesses and had understood the facts and issues discussed.

10  For example, the ALJ closely followed Dr. Fay's testimony and directed questions focused on

11  Dr. Fay's discussions with Parents about potential services for Student (AR at 142-146); the ALJ

12  made specific inquiries of Dr. Bailey about how the Parents were supposed to fully participate in

13  a guidance team meeting if they were not informed of all potential intervention options (AR at

14  1741); and the ALJ questioned Dr. Rowden about his qualifications and about his opinions

15  regarding Student's treatment.  (AR at 853-859.)  Accordingly, there is ample reason to conclude

16  the ALJ was thorough and careful in making findings regarding the KOSHK date and that due

17  weight should be given.

18          Notwithstanding, Plaintiffs argue little to no deference should be given to the ALJ's

19  KOSHK finding because the hearing officer "misapplie[d], misstate[d], and omit[ted] material

20  facts in the Order." (Dkt. 13 at 7.)  As support, Plaintiffs first assert paragraph 11 of the finding

21  of fact did not identify that Parents moved over the summer of 2016 because they wanted to

22  upsize their home and because Student was being bullied.  (*Id.*)  Instead, paragraph 11 stated

23  only that Parents moved so Student could attend a new school for the eighth grade and that

24  Parents hoped she would be able to earn better grades.  (AR 4618.)  However, the record did

support the ALJ's finding in paragraph 11, *see supra* Section II.A., and Plaintiffs provide no explanation as to how the wording of this finding affected the ALJ's determination of the KOSHK date.

Plaintiffs also assert, "[w]ith respect to ALJ Becker's [finding that the district never implemented one-to-one coaching], Dr. Fay never explained to Parents that "one-to-one coaching" was synonymous with special education." (Dkt. No. 13 at 7.) Instead, "[Mother] and the District testified that the Student was receiving one-on-one coaching from District staff." (*Id.*) Nonetheless, the record did establish the one-to-one coaching Dr. Fay described was never implemented because the District had a completely different understanding of Dr. Fay's recommendation. *See supra* Section II.A.

Plaintiffs also identify that the ALJ "note[d] that the report from the interview conducted by Stacie Keirsey was not provided to the District while failing to note that the report also was not provided to Parents." (Dkt. No. 13 at 7.) While this is correct, the ALJ's KOSHK decision did not reference the absence of Ms. Keirsey's clinical interview report as a key factor in her finding. (*See* AR at 4650.) Moreover, Mother acknowledged reviewing with Ms. Keirsey the interview results, and therefore had knowledge of them. (AR at 2941-2942.)

Plaintiffs further take issue with the ALJ's finding that the District suggested Student could access eighth grade math material through summer school or through a private program. (Dkt. No. 13 at 7.) They also assert it was unclear what "summer school" meant. (*Id.*) While this might be true, it is unclear how further explanation of the meaning of summer school would have affected the KOSHK analysis.

Plaintiffs also take issue with the use of Mother's testimony that she was "grasping at straws and trying to think of anything that might help" Student. (Dkt. No. 13 at 8.) This,

1  however, was Mother's testimony in response to a question about her mindset in communicating

2  with Dr. Morgan.  (AR at 3146.)  Quoting Mother's testimony was not misleading.

3         Lastly, Plaintiffs argue the ALJ misused Mother's use of the phrase "Hail Mary pass"

4  because Parents repeatedly testified the family moved to Texas because of an employment

5  opportunity and for additional family support.  (Dkt. No. 13 at 8.)  The ALJ, however, did note

6  that "the Student's family decided to move to Texas that coming summer.  The Mother had

7  gotten a job there and the Student was excited to move closer to her extended family."  (AR at

8  4627.)  At the same time, Mother was directly asked, "So did you think moving to Texas was a

9  Hail Mary to try to help your daughter?"  She responded, "I did, yes."  (AR at 3197.)  Thus,

10 although the reasons for the move to Texas varied, it cannot be concluded that the ALJ made a

11 misleading finding.

12        In short, there is no basis to conclude the ALJ misstated or omitted material facts related

13 to the KOSHK date finding.  Due deference should be afforded.

14              3.  <u>Parents KOSHK Date Was No Later Than October 2017.</u>

15        Paragraphs 17 and 18 of the ALJ's Conclusion of Law (AR at 4650-4651) thoroughly

16 summarize the evidence supporting a KOSHK date of no later than October 2017.  It is evident

17 that by October 2017 the Parents knew the District's interventions during the 2016-2017 school

18 year were ineffective.  (AR at 2597.)  Parents had not observed any successes such as attending

19 class, passing grades, or any positive peer or teacher relationships.  (AR at 2600.)  Parents

20 acknowledged the issues were much greater than grade levels or attendance at a small versus

21 large school.  (AR at 2622-2623.)  Parents otherwise recognized something different was needed

22 as the Parents were seeking any type of outside help they could find.  (AR at 3146.)

23        Plaintiffs' reliance on *Avila*, *Paradise Valley*, *Samoza*, and *Draper* as support for a

24 KOSHK date after October 2017 is not supported.  *Avila* identified only that the date a parent

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT AND REMANDING FOR FURTHER
PROCEEDINGS - 20

became aware of a student's evaluation for a learning disability *alone* is insufficient to support a KOSHK finding.  852 F.3d at 944.  *Paradise Valley* did not involve an IDEA claim.  *See supra* note 6.  *Samoza* involved an agreed record that the Second Circuit declined to analyze further. 538 F.3d at 114 n.9 ("Because the parties agree . . . , our use of June 2003 as the accrual date takes no position on when a parent is presumed to know or should know about a denial of a FAPE . . .  or whether plaintiff's mother in the instant case knew or [should] have known about the alleged facts any earlier than 2002-2003.").

Regarding *Draper*, it involved a school district that evaluated and misdiagnosed a student with an intellectual disability rather than a specific learning disability.  The Eleventh Circuit determined it was not until after the student was reassessed that the parents knew or should have known about the misdiagnosis and the injury to the student, and otherwise declined to blame the parents "for not being experts about learning disabilities."  518 F.3d at 1288.  The facts in *Draper* are entirely different.  The ALJ's analysis supporting the KOSHK date in this case is an application of the law to the record.  It is not an attempt to blame Parents for not being experts about learning disabilities.

In short, this Court agrees with the ALJ's conclusions about the KOSHK date in this case and otherwise incorporates herein her analysis (paragraph s17 and 18) of her conclusions of law. (AR at 4650-4651.)

**B.  Additional Findings Are Needed To Determine Whether The Second Exception To the Statute of Limitations Applies Regarding Plaintiffs' 2016-2017 FAPE Claim.**

1.  <u>First Exception to Statute of Limitations is Inapplicable</u>.

20 U.S.C. § 1415(f)(3)(D)(i)[7] tolls the statute of limitations "if the parent was prevented from requesting the hearing due to . . . misrepresentations by the local educational agency that it had resolved the problem forming the basis of the complaint[.]"  Plaintiffs assert this exception applies because Student's middle school counselor misrepresented Student's eligibility for special education and the District otherwise lullabied Plaintiffs into believing it was doing everything it could to assist Student.  (Dkt. Nos. 13 at 38-43, 22 at 9-11.)  Though the school counselor's comments about eligibility may be characterized as a misrepresentation, and while it is clear Parents had a good relationship with District employees, there is no evidence District employees represented they "had *resolved* the problem forming the basis of" the Plaintiffs' complaints.  Thus, because the District never communicated it had "resolved the problem" now complained of by Plaintiffs, the first exception is inapplicable.

2.  <u>Further Findings Are Needed to Determine Whether Second Exception to the Statute of Limitations Applies.</u>

20 U.S.C. § 1415(f)(3)(D)(ii)[8] tolls the statute of limitations "if the parent was prevented from requesting the hearing due to . . . the local educational agency's withholding of information from the parent that was required under this subchapter to be provided to the parent."  Plaintiffs argue the ALJ erred in concluding the District had no obligation to provide IDEA procedural safeguards notice during the 2016-2017 school year.  They reach this conclusion by asserting the District failed its child find obligations, which, had they been met, triggered the District's obligation to provide procedural safeguards notice because the Student was a child with a disability.  (Dkt. Nos. 13 at 42-44, 22 at 11-17.)  The ALJ, however, never determined whether

---

[7] WAC 392-172A-05080(2)(a), the corresponding state regulation, is for all intents and purposes identical.
[8] WAC 392-172A-05080(2)(b), the corresponding state regulation, is for all intents and purposes identical.

1    the District violated its child find obligation during the 2016-2017 school year, or whether

2    Student was a child with a disability because the ALJ concluded such claim was time-barred.

3    (AR at 4652.)

4              i.      *Child Find Obligations.*

5          School districts are obligated to find and identify children who may need special

6    education services.  20 U.S.C. § 1412(a)(3).  Upon identification, a child must be evaluated and

7    assessed for all suspected disabilities so that a school district can determine what special

8    education and related services are needed.  20 U.S.C. §§ 1412(a)(7), 1414(a)-(c).  "That this

9    evaluation is done early, thoroughly, and reliably is of extreme importance to the education of

10   children.  Otherwise, many disabilities will go undiagnosed, neglected, or improperly treated in

11   the classroom." *Timothy O. v. Paso Robles Unified Sch. Dist.*, 822 F.3d 1105, 1110 (9th Cir.

12   2016).  Failing to comply with the IDEA's procedural requirements may result in the denial of a

13   FAPE.  *Id.* at 1118.  "[P]rocedural violations that substantially interfere with the parents'

14   opportunity to participate in the IEP formulation process, result in the loss of educational

15   opportunity, or actually cause a deprivation of educational benefits 'clearly result in the denial of

16   a [free appropriate public education.]'" *Id.* (quoting *Amanda J. ex rel. Annette J. v. Clark Cty*

17   *Sch. Dist.*, 267 F.3d 877, 892 (9th Cir. 2001)).

18             ii.     *IDEA and Washington Procedural Safeguards Notice Requirements*

19         Procedural safeguards notice (1) "shall be given" once a year to parents of a child with a

20   disability, which includes a child with a specific learning disability or a serious emotional

21   disturbance and who, as a result, needs special education and related services, and (2) an

22   additional copy "shall be given" when a child is initially referred or when a parent requests an

23

24

evaluation.  20 U.S.C. §§ 1415(d)(1)(a) and 1401(3)(A).[9]  Similarly, a district "must provide a copy" of procedural safeguards to parents of a "student eligible for special education services one time a year", and upon initial referral or a request for evaluation.  Wash. Admin. Code § 392-172A-05015(1).[10]  A "student eligible for special education services" includes (1) "a student who has been evaluated and determined to need special education services because of having a disability" and (2) "For purposes of providing a student with procedural safeguard protections . . . includes a student whose identification, evaluation, or placement is at issue." Wash. Admin. Code §§ 392-172A-01035(1)(a)-(b).

---

[9] 20 U.S.C. § 1415(d)(1)(A) states:

> A copy of the procedural safeguards available to the parents of a child with a disability shall be given to the parents only 1 time a year, except that a copy also shall be given to the parents- -
> (i)     upon initial referral or parental requests for evaluation;
> (ii)    upon the first occurrence of the filing of a complaint under subsection (b)(6); and
> (iii)   upon request by a parent.

20 U.S.C. § 1401(3)(A) defines "child with a disability" to include a child:
> (i)     with intellectual disabilities, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance (referred to in this chapter as 'emotional disturbance'), orthopedic impairments, autism, traumatic brain injury, or other health impairments, or specific learning disabilities; and
> (ii)    who, by reason thereof, needs special education and related services.

[10] Washington Administrative Code § 392-172A-05015(1) states:
> School districts must provide a copy of the procedural safeguards that are available to the parents of a student eligible for special education services one time a school year; and:
> (a) Upon initial referral or parent request for evaluation;
> (b) Upon receipt of the first state complaint and receipt of the first due process complaint in a school year;
> (c) When a decision is made to remove a student for more than ten school days in a year, and that removal constitutes a change of placement; and
> (d) Upon request by a parent.

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT AND REMANDING FOR FURTHER PROCEEDINGS - 24

1    Read together, the sections of the IDEA and the Washington Administrative Code at

2 issue in this case are not in conflict.  Each has a triggering event that obligates a district to

3 provide procedural safeguards notice.  Under the IDEA, the triggering event is a student who is a

4 "child with a disability".  Under the Washington Administrative Code, the triggering event is a

5 student "whose identification, evaluation, or placement is at issue."  Neither demand that a

6 formal evaluation be conducted before a district is obligated to provide procedural safeguards

7 notice.

8    Here, without first determining whether the Student was a child with a disability or a

9 student whose identification, evaluation, or placement was at issue, the ALJ erred in concluding

10 that "none of the requisite circumstances that require provision of the Procedural Safeguards had

11 occurred" and otherwise erred in automatically concluding the statute of limitations barred all

12 claims related to the 2016-2017 school year.  (AR at 4652.)

13        iii.    *The Second Exception to the Statute of Limitations May Be Applicable;
                  Further Findings Required.*

14

15    If Plaintiffs establish the Student was a child with a disability (or a student whose

16 identification, evaluation, or placement was at issue) during the 2016-2017 school year, the

17 District was required to provide Parents with procedural safeguards notice.  *See supra* IV.B.2.ii.

18 If parents meet this burden, then whether the statute of limitations bars Plaintiffs' 2016-2017

19 claims depends on whether the Parents can establish they were "prevented from requesting the

20 [due process] hearing due to" the District "withholding" of the procedural safeguards notice.  20

21 U.S.C. § 1415(f)(3)(D)(ii).  If Plaintiffs meet these burdens, the second exception to the statute

22 of limitations would apply to Parents' alleged 2016-2017 child find violation and FAPE claim.

23    The District, however, asserts this conclusion would be "directly contrary to the express

24 language of the IDEA enumerating the circumstances under which districts are required to

1   provide such notice" (Dkt. No. 20 at 30) and argues this Court "should decline Parents'

2   invitation to expand the definition of a 'child with a disability' to a student not yet found eligible

3   where Congress itself declined to do so." (Dkt. No. 26 at 10.)  However, as already shown,

4   *supra* IV.B.2.ii., the plain language of the relevant sections of the IDEA and of the Washington

5   Administrative Code do support this conclusion.  Moreover, the definition of a child with a

6   disability does not require a district to first determine whether the student is "eligible" for special

7   education before being classified as a child with a disability.  The definition requires only a child

8   that "needs special education and related services."  20 U.S.C. § 1401(3)(A).  Put another way, a

9   child in need of special education needs special education regardless of whether a District has

10  found the child eligible for special education; they are two distinct issues.  Similarly, the

11  Washington Administrative Code does not require that a district have found a student eligible for

12  special education services, only that the student be one "whose identification, evaluation or

13  placement is at issue."  *See* Wash. Admin. Code § 392-172A-01035(1)(b).

14      The District also asserts the district court decisions Plaintiffs cite as support for the

15  conclusion that it failed to provide procedural safeguards notice are distinguishable and

16  otherwise not persuasive.  (Dkt. Nos. 20 at 31; 26 at 10-11.)  Notwithstanding those decisions,

17  this Court reached its own conclusion based on the plain language of the IDEA and Washington

18  Administrative Code, *supra*.

19      The District further argues that *D.K. v. Abington Sch. Dist.*, 696 F.3d 233 (3d Cir. 2012)

20  rejected Plaintiffs' argument and that this Court should too.  (Dkt. No. 20 at 31.)  *D.K.*, however,

21  contains no analysis of the first part of 20 U.S.C. § 1415(d)(1)(A).  *D.K.* also, of course, never

22  discussed the language of Washington Administrative Code § 392-172A-05015(1) or the

23  definition of a "student eligible for special education services" contained in Washington

24  Administrative Code § 392-172A-01035(1)(b).  In addition, the Third Circuit accepted the

finding that there was insufficient basis to believe the student in that case suffered from a "mental impairment that substantially limited one or more of his major life activities" *before* the parents requested an initial evaluation.  696 F.3d at 243.[11]  This was because "the problems experienced by D.K., which later triggered a second special education evaluation, were not so pronounced in his earlier development."  *Id*.  Thus, in *D.K.* there would have been no basis to find the child was a "child with a disability" before the parents had requested an initial evaluation, thereby making the first part of 20 U.S.C. 1415(d)(1)(A) inapplicable.

Moreover, the fear that any claim involving the failure to provide procedural safeguards notice "would all but eviscerate the statute of limitations" (Dkt No. 20 at 31) is a bit inflated as any parents making such a claim must still establish they were prevented from requesting a hearing due to the withholding of the procedural safeguards notice.  20 U.S.C. § 1415(f)(3)(D)(ii).  This conclusion is not always a foregone conclusion and will depend on the facts of each case.

In short, additional findings are needed before it can be determined whether 20 U.S.C. § 1415(f)(3)(D)(ii) (or the corresponding Washington Administrative Code) applies to Plaintiffs' 2016-2017 claims.

**C.  Additional Findings Are Required to Determine Amount of Tuition Reimbursement and Any Other Equitable Relief.**

1.  <u>The Court Disagrees Tuition Reimbursement Should Have Been Terminated Upon Parents' Move Out of District.</u>

A district court has authority to review de novo a reimbursement award and is "free to determine independently how much weight to give the state hearing officer's determinations."

---

[11] In the Third Circuit, "'[f]actual findings from the administrative proceedings are to be considered prima facie correct,' and if [we] do[ ] not adhere to those findings,' we must 'explain why.'"  *Id*. (citation omitted).  In *D.K.* the Third Circuit adhered to the administrative officer's findings as it never explained anything to the contrary.

1    *Ashland*, 587 F.3d at 1182.  After analyzing a hearing officer's conclusions, "'the court is free to

2    accept or reject the finding in part or in while.'"  *Id.* (quoting *Gregory K. v. Longview Sch. Dist.*,

3    811 F.2d at 1311).  In the end, a district court has "broad discretion to craft relief under 20

4    U.S.C. § 1415(i)(2)(C)."  *Id.* at 1183.

5            As a preliminary matter, the District argues that because the reimbursement award was an

6    equitable award for compensatory education and because Plaintiffs failed to challenge the ALJ's

7    "equitable ruling," Plaintiffs are barred from challenging the award of compensatory education.

8    (Dkt. 26 at 14.)  While at first glance there is some appeal to this argument, it is clear from the

9    record that Plaintiffs disputed ALJ's rationale for terminating reimbursement once the Parents

10   moved out of the District.  Undeniably, Plaintiffs' appeal challenges the ALJ's reimbursement

11   decision.  The Court, therefore, determines a de novo review of the reimbursement award is

12   proper.

13           Neither party disputed that the District failed to provide FAPE during the 2017-2018

14   school year (AR at 4656) and that Solstice RTC was a proper placement.  (AR at 4659.)  Nor did

15   they disagree that Plaintiffs were entitled to reimbursement for private placement.  (*Id.*)  Instead,

16   the parties dispute when reimbursement should have terminated.

17           The ALJ recognized the right to tuition reimbursement is triggered when a child is denied

18   FAPE at the time private placement occurs.  (AR at 4656) (citing *Florence Cnty Sch. Dist. v.

19   Carter*, 510 U.S. 7 (1993); *Burlington v. Dep't of Educ.*, 471 U.S. 359 (1985)).  She then

20   concluded Parents' residency was the determinative factor in terminating the District's

21   reimbursement obligations.  (AR at 4660) ("After the Parents moved [out of the District], there

22   was insufficient nexus to the Student to continue to hold the District Responsible for ongoing

23   provision of FAPE.").  To reach this conclusion, the ALJ focused on the  residency requirements

24

1    and the extent to which the District had any on-going FAPE obligations to a Student (and

2    parents) who live outside of the District.  (AR at 4659-4660.)

3            This focus is peculiar because Student already had moved to Utah and, as the District

4    noted, "the only obligation that the District had to Student under the IDEA and Washington law

5    was to have provided Student a FAPE <u>while she was a resident of the District</u>."  (Dkt. No. 26 at

6    14.)  The District also identified that the ALJ's reimbursement award "was not based on the

7    District having some continuing service obligation to Student[.]" (*Id*.)  This was because "during

8    [her time at Solstice RTC], the District had <u>no</u> obligation to provide Student any special

9    education services, including the obligation to evaluate Student to determine if she qualified for

10   an IEP." (Dkt. No. 20 at 34.)  The Court agrees with the District on these points.  Accordingly,

11   the ALJ's reimbursement decision premised on whether there was an on-going FAPE obligation

12   was in error.  The reimbursement analysis should have focused on the District's failure to

13   provide a FAPE in the *first instance*, which resulted in Student's proper placement in Utah.[12]

14           The right to reimbursement is triggered when the "public placement violated [the] IDEA

15   and [] the private placement was proper under the Act." *Florence*, 510 U.S. at 15.  20 U.S.C.

16   1415(i)(2)(C)(iii) has been construed "to authorize reimbursement when a school district fails to

17   provide a FAPE and a child's private-school placement is appropriate, without regard to the

18   child's prior receipt of services." *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 243 (2009).

19   There is no requirement that a child or parent remain living within a school district to qualify for

20

21

22   [12] Both parties spent significant time in analyzing residency requirements and whether the
     District had an on-going FAPE obligation while the Student was at Solstice RTC.  Residency
23   issues are not discussed because the Court concludes reimbursement under the circumstances is
     not dependent on any "on-going" FAPE obligation.  It is based on the past failure to provide a
24   FAPE at the time placement occurred.

reimbursement under the IDEA when a school district fails to provide a FAPE.  As noted by the Third Circuit,

> Continuity of residence cannot be a prerequisite to the grant of compensatory education. . . . [A] rule that rendered IDEA claims for compensatory education moot upon a move out of district would allow 'a school district [to] simply stop providing required services to a student with the underlying motive of inducing this student to move from the district, thus removing any future obligation under the IDEA, which the district may owe to the student,' and thereby frustrating the purpose of the IDEA.

*D.F. Collingswood Borough Bd. of Educ.*, 694 F.3d 488, 497 (3d 2012).  Moreover, "[t]o comply with the IDEA, a school district no longer responsible for educating a child must still be held responsible for its past transgressions."  *Id.* at 497.  After all, "[a]n order awarding reimbursement of private-education costs when a school district fails to provide a FAPE merely requires the district to 'belatedly pay expenses that it should have paid all along.'"  *Forest Grove*, 557 U.S. at 246 (quoting *Burlington*, 471 U.S. at 370-371).  It, therefore, does not follow that the District's tuition reimbursement obligation should hinge solely on the Parents' continued residency within the District's boundaries.

Based on the Court's analysis, *supra*, no weight is given to the ALJ's reimbursement cutoff decision and the Court will exercise its authority under 20 U.S.C. § 1415(i)(2)(C) to determine relief.

2.   Additional Findings Necessary to Determine Extent of Tuition Reimbursement.

"Courts retain discretion to reduce the amount of a reimbursement award if the equities so warrant—for instance, if the parents failed to give the school district adequate notice of their intent to enroll the child in private school.  In considering the equities, courts should generally presume that public-school officials are properly performing their obligations under the IDEA."  *Forest Grove*, 557 U.S. at 247.  Additional factors to consider in determining a reimbursement amount include existence of alternative placements more suitable for a student, and "the general

cooperative or uncooperative position of the school district." *Forest Grove Sch. Dist. v. T.A.*, 523 F.3d 1078, 1089 (9th Cir. 2008).

First, in this case there is no presumption the District was properly performing its obligations under the IDEA when its reimbursement obligation was triggered.  This is because the ALJ concluded, and neither party disputed, the District failed its obligations under the IDEA at the time Student was placed at Solstice RTC.

Second, the Court does not fault, nor would the equities warrant faulting, Parents for notifying the District until after Student was placed at Solstice RTC because the District had already violated its IDEA obligations and the Student needed dire assistance.  She had just overdosed on alcohol for a *third* time and Parents' decision to place Student at Solstice RTC was "mostly just a desperation to save my daughter's life."  (AR at 2661.)  The District already had its opportunity to meet its IDEA obligations, and it failed.  Under these circumstances, there was no advantage or disadvantage in the District learning of Student's placement prior to its occurrence.

Third, the ALJ concluded, and no party disputed, that Student's placement at Solstice RTC was proper.  There, therefore, is no reason to believe there was a more appropriate placement for Student.

Fourth, the ALJ's reliance on *Ashland* as support for the position that Plaintiffs' desire to obtain reimbursement demonstrates a lack of genuine participation in an after-the-fact IEP process is misplaced.  In *Ashland*, the school district had provided IEPs to the student.  "Parents had never complained about any of the IEPs.  The fact that Parents raised no objections to [the student's] IEP until they realized that doing so was a prerequisite to reimbursement belies their claim that their complaint with the IEP is genuine."  587 F.3d at 1186.  Here, Parents did not choose private placement over an already established IEP.  Private placement occurred because

of the District's failure to meet its IDEA obligations.  Equities, therefore, do not warrant faulting Plaintiffs for having "an intense interest in obtaining reimbursement" (AR at 4662) for incurring significant "expenses that [the District] should have paid all along[.]"  *Forest Grove*, 557 U.S. at 246.  Moreover, if Parents' interest in obtaining reimbursement demonstrated a lack of genuine participation in an after-the-fact IEP process, what conclusions might be drawn of the District's own "intense interest" in participating in such process where the District ceaselessly insisted it owed no obligation to Student upon her moved to Utah (and even more so after her Parents had moved)?

Fifth, the Court also disagrees the Parents' failure to notify the District of their move should limit reimbursement.  While the Court would expect parents to proactively inform a District of a move outside of a district's boundaries, the lack of notice in this case did not prejudice the District.  This is because Student already was residing in Utah.  (AR at 2291.)  The District already had taken the position it owed no obligation to Student.  (AR at 6586; Dkt. No. 20 at 34.)  The District already had unenrolled Student from the District.  (AR at 1007-1008, 6873.)  Student already had participated in the District's independent evaluation.  (AR at 4892-4918.)  Both parties already had attorneys involved advising each of them.  (AR at 6585, 6799.)  Thus, Parents' residence inside or outside the District's boundaries had no effect on positions or actions taken during the after-the-fact IEP process.

Lastly, and the reason further findings are necessary, the District did produce an IEP in March of 2019 that proposed the immediate transition from Solstice RTC to a comprehensive high school with therapeutic supports.  (AR at 6823.)  The ALJ never determined whether such IEP was appropriate.  Even though the Northshore School District rather than the District would have been responsible for implementing the IEP, there would have been no need for Plaintiffs to

1   continue incurring private placement costs after March 19, 2019 if the IEP would have provided
2   a FAPE.

3       Having considered the reimbursement de novo, the Court concludes reimbursement is
4   owed to Plaintiffs for Solstice RTC costs and expenses through March 19, 2019, the date when
5   an IEP was produced.  However, the matter is remanded to determine whether the proposed IEP
6   would have provided Student a FAPE.  If it is determined that the March 19, 2019 IEP was
7   appropriate, considering Student's unique circumstances and the reasons for her placement at
8   Solstice RTC, then Plaintiffs are not entitled to any additional mandatory reimbursement.  If,
9   however, it is determined that the March 19, 2019 IEP was not appropriate, given Student's
10  unique circumstances and the reasons for her placement at Solstice RTC, then Plaintiffs are
11  entitled to reimbursement for Student's entire placement at Solstice RTC.  Again, if the March
12  2019 IEP would have provided a FAPE (even though the Northshore School District would have
13  been responsible for implementing it), there would have been no need for Plaintiffs to incur
14  private placement costs after that date.[13]

15      In addition, even after these additional findings are made, the ALJ may award any
16  additional compensatory education believed to be appropriate and proper.

17                          **V.      CONCLUSION**

18      The Court, having reviewed the Administrative Record, Plaintiffs' Motion for Summary
19  Judgment (Dkt. No. 13), Defendant's Cross Motion for Summary Judgment (Dkt. No. 20), the

20
21

22  [13] The Court does not address Plaintiffs' allegation that the District denied Student a FAPE
    during the 2018-2019 school year because the Court agreed with the District that it did not have
23  an on-going obligation to provide a FAPE once the Student moved out of the District.  Though as
    already identified, the District did have a reimbursement obligation as the District had denied
24  Student a FAPE at the time private placement occurred.

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT AND REMANDING FOR FURTHER
PROCEEDINGS - 33

memorandum filed in support and against each motion, and the remaining record, hereby ORDERS as follows:

(1) This matter is REMANDED for further proceedings.

(2) With respect to Plaintiffs' claims related to Student's 2016-2017 school year, the Administrative Law Judge SHALL determine whether the exception to the statute of limitations contained in 20 U.S.C. § 1415(f)(3)(D)(ii) and/or Washington Administrative § 392-172A-05080(2)(b) applies by determining:

    a.  Whether during the 2016-2017 school year the Student was a "child with a disability" (20 U.S.C. § 1401(3)(A)) or a "student whose identification, evaluation or placement [was] at issue" (Wash. Admin. Code § 392-172A-01035(1)(b)); and

    b.  If necessary, whether the Parents were "prevented from requesting the [due process] hearing due to" the District "withholding" of the procedural safeguards notice.  20 U.S.C. § 1415(f)(3)(D)(ii); Wash. Admin. Code § 392-172A-05080(2).

(3) With respect to Plaintiffs' reimbursement request for private placement, Plaintiffs are entitled to reimbursement for costs and expenses related to private placement through March 19, 2019.  In addition, the Administrative Law Judge SHALL determine:

    a.  Whether the District's March 19, 2019 proposed IEP would have provided Student with a FAPE.  If it is determined that the March 19, 2019 IEP was appropriate, considering Student's unique circumstances and the reasons for her placement at Solstice RTC, then Plaintiffs are not entitled to any further reimbursement for Student's placement at Solstice RTC.  If it is determined that the March 19, 2019 IEP was not appropriate, given Student's unique

1    circumstances and the reasons for her placement at Solstice RTC, then

2    Plaintiffs are entitled to reimbursement for Student's entire placement at

3    Solstice RTC.

4    (4)  The Administrative Law Judge may award any additional compensatory education

5    believed to be appropriate and proper consistent with this Order.

6    (5)  The Administrative Law Judge may award any fees or costs allowed by statute.

7    The Clerk is directed to send uncertified copies of this Order to all counsel of record and

8    to any party appearing pro se at said party's last known address.

9    Dated this 31st day of January, 2022.

David G. Estudillo
United States District Judge